UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | |
| GLOBAL PROCESSING, INC., | Chapter 11 |
| Debtor | Bankruptcy No. 22-00669 |

### RULING ON UNITED STATES TRUSTEE'S MOTION TO CONVERT OR DISMISS

The matter before this Court is the United States Trustee's ("UST") Motion to Convert Case to Chapter 7 (Doc. 228) or, alternatively, to appoint a Chapter 11 Trustee. The Iowa Department of Agriculture and Land Stewardship and the Iowa Grain Depositors and Sellers Indemnity Fund (collectively "IDALS" here) as well as Farmers Trust & Savings Bank and the Official Committee of Unsecured Creditors joined the UST's motion. See Docs. 244, 247, 268. Debtor resists these motions and alternatively has proposed to appoint a Chief Reorganization Officer. The Court held evidentiary hearings on June 7–8, 2023. Ronald C. Martin and Erica L. Yoder appeared for the Debtor. Janet G. Reasoner appeared for the Office of the United States Trustee. Lindsey L. Browning and Jacob Larson appeared on behalf of IDALS. Bradley R. Kruse appeared for Chris Olson. Brian D. Jones appeared for Farmers Trust & Savings Bank. Michael S. Dove appeared for the Official Committee of Unsecured Creditors. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## I.   STATEMENT OF THE CASE

The parties moving for conversion to Chapter 7 or appointment of a Chapter 11 Trustee assert the Debtor's owner, David Wilcox, has engaged in fraud or improper behavior that has harmed the estate. They allege continuing harm if he is left in charge. Debtor argues that unusual circumstances exist under Section 1112(b)(2) and conversion should be denied. Rather, Debtor argues in the alternative that Greg DeWeese should be appointed as Debtor's Chief Reorganization Officer and that Mr. Wilcox will surrender decision-making authority to DeWeese. For the reasons that follow, this Court grants UST's Motion to Appoint a Chapter 11 Trustee.

## II.   PROCEDURAL HISTORY AND FACTUAL RECORD

During the two days of evidentiary hearing on the Motion to Convert, parties engaged in extensive discussions on and off the record regarding dismissal, conversion, and potential alternatives. No agreement was reached but the UST and Debtor both proposed alternatives for the Court to consider. The Court finished the evidentiary hearing and provided the parties the opportunity to amend pleadings in order to clarify their positions. Both sides formalized their alternatives: the UST proposed the alternative of appointing a Chapter 11 Trustee while Debtor proposed appointing DeWeese as Chief Reorganization Officer.

The Court later held an emergency interim hearing on a related issue—authority for approval of grain contracts DeWeese had worked out with several of his contacts within the industry. The Court took extensive additional testimony from DeWeese about the proposed agreements. The Court ultimately denied most of the relief requested, primarily because most creditors remained opposed to the contracts—and stood on their original request for conversion to Chapter 7 or the new alternative of appointing a Chapter 11 Trustee.

### III.    FINDINGS OF FACT

The UST, IDALS, and Farmers Trust & Savings Bank offered substantial credible evidence to support the Motions to Convert or Appoint a Chapter 11 Trustee. Much of it came from the Debtor's own documents and witnesses. In particular, those parties elicited much frank and damaging testimony from DeWeese in his role as financial consultant. DeWeese acknowledged (as Debtor has throughout this case) that the books and financial records of the Debtor were a serious mess. DeWeese was brought on mid-October 2022 to, among other tasks, help prepare the bankruptcy schedules and statement of financial affairs. Doc. 305, at 140. In fulfilling his duties, DeWeese testified that he initially had difficulty understanding Debtor's financial reporting system and reconciling the balance sheet accounts. Id. at 141–42. In fact, DeWeese explained that "things came to surface" each month since the bankruptcy filing, including "loans" from Debtor to Debtor's principal, David Wilcox, and a variety of miscellaneous charges DeWeese identified as being for the benefit of Mr. Wilcox. Id. at 143–44. DeWeese uncovered roughly $8.3 million in issued checks that had not been cashed, roughly $5 million in deposits that were recorded in Debtor's accounting system but that were not cleared or deposited into its bank account, at least 300 bank transactions from 2022 that were not recorded in Debtor's accounting system, and a $1 million reconciliation discrepancy that DeWeese did not fully investigate. Id. at 164–66. DeWeese discovered that the recorded grain inventory quantities were inaccurate, that there were over $3.5 million in royalties due under a purchase contract through Debtor's Kanawha, Iowa facility that were never paid and never recorded, and that insurance on Debtor's property was allowed to lapse after a returned check went unnoticed. Id. at 151, 157–59. These discoveries ultimately necessitated amending the bankruptcy schedules (Doc. 86) and amending monthly operating reports (Docs. 146, 147).

The principal of Debtor, David Wilcox, was called to testify by the UST. He asserted his Fifth Amendment right against self-incrimination in a blanket fashion. While the UST objected to this blanket assertion, the Court allowed it with the understanding that the Court would make two express findings. First, all the evidence received at the hearing thus far showed some very troubling conduct by Debtor that had harmed the estate. Second, the Debtor's assertion of his Fifth Amendment rights, instead of explaining the areas of grave concern for the Court, would result in the Court drawing further negative inference from his testimony.

IDALS also presented evidence that Debtor, through fraud, incompetence, and/or a lack of careful operation, had violated Iowa state law governing the operation of grain processors and grain warehouses, causing significant losses to farmers who placed their grain with Debtor for processing and/or sale. The number of farmers experiencing losses and the total value of the losses was very significant. Specifically, IDALS offered the testimony of Jared Christensen, a grain dealer and warehouse examiner for IDALS Grain Warehouse Bureau, who inspected Debtor's Kanawha, Iowa facility in October of 2022. During this inspection, Christensen discovered between 20 to 50 checks that had not been sent out to farmers within the five-day time frame required by Iowa state law. Upon further inspection, Christensen uncovered what amounted to roughly $4.7 million in withheld checks. Doc. 305, at 39. Christensen also testified that when he asked employees at the facility why the checks were being held, they responded that it was at the direction of Wilcox. Id. at 37.

IDALS also offered the testimony of James Kennedy, Grain Warehouse Bureau Chief for IDALS. Kennedy testified that the Grain Warehouse Bureau suspended Debtor's licenses (Grain Dealer 5236 and Warehouse 4951) after Christensen's inspection for multiple alleged violations of state law including withholding checks and failing to submit monthly financial statements. Id. at 63–

64. Kennedy also clarified that Christensen's October 2022 inspection was brought on by complaints from the farming community about returned checks or nonpayment for grain and soybean deliveries. Id. at 75. Debtor had a history of violations with the Grain Warehouse Bureau—violations that Wilcox admitted to in a joint stipulation agreement. Id. at 67–69. Kennedy explained that based on this history of violations, the continuing complaints from the farming community, and the outcome of Christensen's inspection, the license suspensions were appropriate, paired with more frequent inspections. Id. at 77. Kennedy testified the Grain Warehouse Bureau uncovered prior evidence of Debtor "purchasing" grain with checks through another Iowa grain dealer, Midwest Soya International, in violation of the joint stipulation agreement that required Debtor to only purchase grain with bank-issued cashier checks. Id. at 87–95. Debtor, in a pseudo-assignment fashion, had Midwest Soya collect grain from the producers and then deliver the grain to Debtor who would send checks to Midwest Soya. Id. Debtor's checks were often returned for insufficient funds and thus Midwest Soya did not pay the producers for their grain. Id. Roughly 100 accounts of producers in contract with Debtor had not been paid through this scheme. Id. at 95.

This part of the record was largely undisputed. Debtor's counsel offered an argument essentially that Debtor had done its best to comply with the stipulation agreement and that any record discrepancies were human error rather than evidence of fraud. In response, the Court noted its strong initial inclination to find that no such charitable view was warranted. Further review has confirmed the Court's initial view. Debtor has been poorly and perhaps even fraudulently managed. The pattern and practice of poor record-keeping and missing funds appears to go beyond "human error." The Court finds that Wilcox systematically ignored best business practices, evaded state and federal oversight and regulations, disregarded the corporate form by enmeshing his personal funds with his business,

and harmed grain producers of Iowa and consequently the Iowa Grain Depositors and Sellers Indemnity Fund—in the amount of $2.1 million. See Doc. 305, at 98. The claimed grain dealer losses totaled $4,024,000, which leaves an almost $2 million loss falling directly on Iowa grain producers. This Court finds that the Debtor has had—and likely will continue to have—substantial losses if no changes are made to management. The Court notes that before DeWeese started helping Debtor, there was gross mismanagement.

Debtor, however, put on a strong case of the unusual factors to be considered in opposition to conversion or appointment of a Chapter 11 Trustee. This evidence also revolves almost entirely around Greg DeWeese. DeWeese has essentially turned around the book-keeping problems of Debtor, set up numerous processes to eliminate previous problems, and aggressively set a business strategy for moving forward. DeWeese even lined up several grain contracts that he calculated would bring roughly $2.8 million into the estate after costs. The Court held a separate hearing on an emergency basis on Debtor's motion to authorize execution of these contracts. As noted above, the Court found DeWeese's testimony in support of those contracts to be highly credible (as it has been throughout this case and in others where DeWeese has been before this Court). However, also as noted, the Court rejected Debtor's request to adopt any of the contracts—mainly because virtually all of the participating creditors were opposed to moving forward with the contracts and did not think these contracts would lead to a confirmable plan.

The Court does find, however, that the efforts of DeWeese have been very beneficial to the estate, and he would be a valuable asset moving forward. This is largely undisputed. In fact, based on the involvement of DeWeese, the UST and creditors noted they would support appointment of a Chapter 11 Trustee as an alternative to conversion to Chapter 7. Debtors argued that the Court—with the hopes that DeWeese would remain in his role—should appoint DeWeese as Chief

Reorganization Officer for Debtor, giving him full decision-making authority over the Debtor's operation.  Debtor's counsel noted that Wilcox, the principal owner of Debtor, would specifically agree to cede full authority to DeWeese.  The UST and other parties supporting the UST's motions did not agree, believing this still left Wilcox in ultimate control and with an ability to continue his highly questionable—if not entirely inappropriate—practices.

### IV.  CONCLUSIONS OF LAW

The UST and other creditors continue to support conversion to Chapter 7 or, in the alternative, the appointment of a Chapter 11 Trustee.  Debtor continues to resist all Motions to Convert or appointment of a trustee.  Debtor has moved for appointment of DeWeese as Chief Reorganization Officer at Doc. 346.  The UST's Motion to Convert is based on § 1112 of the Bankruptcy Code, which states in relevant part:

> (b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, **for cause** <u>unless</u> the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the *best interests of creditors and the estate*.
> . . .
> (4) For purposes of this subsection, the term "cause" includes—
>     (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>     (B) gross mismanagement of the estate;
>     (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; . . .
>     (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; . . .
>     . . .

11 U.S.C. § 1112(b)(1), (4) (emphasis added). Before the 2005 amendments to the Bankruptcy Code—widely referred to as BAPCPA—bankruptcy courts had broad discretion under § 1112(b) to convert a case from Chapter 11 to Chapter 7. In re Miell, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009) (citing In re Hedquist, 450 F.3d 801, 804 (B.A.P. 8th Cir. 2006) (applying pre-BAPCPA law)).

> Following BAPCPA's 2005 amendments to the Bankruptcy Code, section 1112(b)(1) is "no longer permissive, but instead mandates conversion or dismissal if the movant establishes exclusive cause, and no unusual circumstances establish that conversion or dismissal is not in the best interest of creditors." However, "[w]hether cause exists under § 1112(b) and, if so, whether dismissal [or conversion] is appropriate are questions left to the sound discretion of the bankruptcy court."

In re Miell, 419 B.R. at 366 (quoting In re New Towne Development, LLC, 404 B.R. 140, 146 (Bankr. M.D. La. 2009) (citations omitted)).

There are, however, two distinct statutory exceptions to mandatory conversion or dismissal after a showing of cause. The first exception to mandatory conversion or dismissal occurs where "the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). The second exception is found in § 1112(b)(2), which states:

> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies *unusual circumstances* establishing that converting or dismissing the case is not in the best interests of creditors and the estate, *and* the debtor or any other party in interest establishes that—
> (A) *there is a reasonable likelihood that a plan will be confirmed* within the timeframes established in sections 1121(e) and 1129(e)

8

Case 22-00669   Doc 406   Filed 10/06/23   Entered 10/06/23 16:06:46   Desc Main
                    Document      Page 9 of 14

of this title, or if such sections do not apply, within a reasonable period of time; *and*

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2) (emphasis added).[1] Both exceptions are at issue here because the Court finds that Movants have shown "cause" for conversion.

### A. Movant's Burden of Establishing "Cause."

The initial burden of proof "lies with the movants to establish a cause for conversion" under § 1112(b)(1). In re Miell, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009). UST alleges that there is cause to dismiss or convert under 11 U.S.C. § 1112(b)(4)(A), (B), (C), and (F). The Court need not address (B), (C), and (F), because the analysis under (A) is dispositive.

### 1. Substantial or continuing loss to or diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation.

To establish "cause" under § 1112(b)(4)(A), movants "must establish both (1) a substantial and continuing loss of or diminution of the estate; and (2) absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). If movants can establish cause under § 1112(b)(4)(A), the "unusual circumstances" exception found in 11 U.S.C. § 1112(b)(1) does not apply and a court must convert to Chapter 7 or dismiss. See In re Plymouth Oil Co., LLC, 2014 Bankr. LEXIS 3278, at *10 (Bankr. N.D. Iowa 2014) ("There is no likelihood Debtor could get a

---

[1] Notably in 2010, Pub. L. 111–327, §2(a)(33)(A)(i), amended 11 U.S.C. § 1112(b)(1), which included the "unusual circumstances" in the first exception as well. Prior to amendment, § 1112(b)(1) read as follows: "Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, *absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate*, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause."

plan confirmed in any reasonably foreseeable time period [and] the Court found cause exists to convert under § 1112(b)(4)(A). *Therefore, Debtor cannot as a matter of law satisfy § 1112(b)(2)(B) because that exception does not apply.*") (emphasis added); see also In re McQuillen Place Co., LLC, 609 B.R. 823, 830 (Bankr. N.D. Iowa 2019) (properly outlining the applicable law with the 2010 statutory amendment as discussed above).

  The Eighth Circuit has found that cause exists under this section when the evidence shows that the debtor has a negative cash flow and no intention of rehabilitating its business. Loop Corp. v. United States Tr., 379 F.3d 511, 518 (8th Cir. 2004) (holding that when debtors intended to liquidate their assets rather than continue their business operations, there was no reasonable likelihood of rehabilitation). Debtor has largely had a negative cash flow. Through the early part of the case, there has been a continuing negative cashflow and diminution of the estate. Debtor's records were in such disarray at the time of filing that much of the "diminution" of estate the UST points to was a hold-over from substantially poor business practices. While there has been some "emendation" of estate, thanks to the work of DeWeese, there has been no showing that it has taken hold to truly establish a positive cash-flow. Moreover, there is real uncertainty whether Wilcox would continue to interfere with or thwart DeWeese's efforts. The Wilcox self-dealing, catastrophic losses to other farmers, and inability to show a legal right to fully operate the business show that an independent decision-maker is needed. The Court finds that movants have met their burden under the first element.

  The second element is a showing of no reasonable likelihood of rehabilitation. This is a close call. Debtor entered Chapter 11 bankruptcy with the intent to continue its business and sell itself as a continuing operation. Debtor's decision to employ DeWeese right before filing for bankruptcy further indicates to the Court that Debtor is taking steps in the right direction. However, this case is

now more than nine months old and no Chapter 11 plan has been filed or even substantively discussed on the record. The Court notes that the time it has taken DeWeese to get Debtor's financial records into a more acceptable state may be the cause for this delay. But the Iowa Attorney General and Unsecured Creditors Committee have indicated that they will not vote for any plan proposed by the Debtor and have opposed even Debtor's attempts to assume contracts that appeared profitable. Debtor has also not explained how it can operate its business without the appropriate state licensure nor has it set forth a plan to obtain reinstatement of the licenses. The vast resistance to the Debtor continuing to operate under the status quo, and the barriers it faces to confirmation, appear insurmountable. Accordingly, the Court finds that movants have also met their burden under this second prong and have therefore established cause under § 1112(b)(4)(A).

Because the Court finds cause under § 1112(b)(4)(A), the Court will not assess whether cause exists under § 1112(b)(4)(B), (C), or (F). Further, because the Court finds cause under § 1112(b)(4)(A), the burden will not shift to the Debtor to show any unusual circumstances under 11 U.S.C. § 1112(b)(2) because that exception is not available as a matter of law. In re Plymouth Oil Co., LLC, 2014 Bankr. LEXIS 3278, at *10 (Bankr. N.D. Iowa 2014). The Court notes, however, that even if it did consider Debtor's arguments on "unusual circumstances," the arguments—though having much merit—would ultimately fail. The "unusual circumstances" that Debtor points to involve the excellent work of DeWeese and the possibilities he has presented for an impressive turnaround. If the only element Debtor needed to show was a decent possibility that DeWeese could help make a turn-around work, Debtor might have been able to prevail. But Debtor is required to show more—most importantly—that there is a real, reasonable likelihood of confirming a plan. The creditors have largely been unified in strongly opposing any possible plan. The state licensing authorities appear to be particularly opposed

to Debtor continuing in any form. Debtor needs licensing to perform many functions it appears to propose. Moreover, in spite of DeWeese's good work in the case, it is doubtful Debtor has any hope of a "cram down" plan over substantial resistance. Finally, creditors are strongly opposed to any continuing involvement of Wilcox. Debtor has not sufficiently explained to the Court or creditors how he could be kept out of all finances and decision-making going forward. Thus, in spite of strong evidence of DeWeese's acumen and thoughtful planning, that alone cannot carry the burden under § 1112(b)(2).

### B. Evaluation of the Best Interest of Creditors and the Estate.

Because cause for conversion has been demonstrated, regardless of whether the motion to convert or dismiss is opposed, the Court must determine whether the best interests of creditors and the estate are served by converting or dismissing the case. In re Modanlo, 413 B.R. 262, 2009 Bankr. LEXIS 2604, at *6 (Bankr. D. Md. June 1, 2009). While the Bankruptcy Code does not define "best interests" for purposes of the § 1112(b)(1) inquiry, courts have outlined a wealth of potential considerations. See In re McQuillen Place Co., LLC, 609 B.R. at 832–33 (compiling considerations and cases). "A court may consider other factors and equitable considerations in order to reach an appropriate result in the individual case." In re Miell, 419 B.R. at 366 (citing In re Kerr, 908 F.2d 400, 404 (8th Cir. 1990)). The court may also consider what outcome creditors favor when determining the best interests of creditors or the estate. Loop Corp. v. United States Tr., 290 B.R. 108, 115 (D. Minn. 2003), aff'd, 379 F.3d 511 (8th Cir. 2004).

Under this caselaw, with the UST and others expressing an interest in an alternative to conversion or dismissal, as well as the authority of 11 U.S.C. § 1112(b)(1), this Court will also consider whether appointment of a Chapter 11 Trustee is in the best interests of creditors and the estate. "The court may choose the alternative of appointing a chapter 11 trustee upon a finding that the business of

the debtor may operate profitably in a bankruptcy and thereby maximize payments to creditors." See 7 Collier on Bankruptcy ¶1112.04[7] (16th ed. 2011). Section 1104(a) governs and requires the appointment of a Chapter 11 Trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, *either before or after the commencement of the case* . . . ; or
> (2) if such appointment is in the interests of creditors . . .
>
> . . .

11 U.S.C. § 1104(a) (emphasis added). After careful review of the record, this Court finds that appointment of a Chapter 11 Trustee is appropriate in this case to maximize payments to creditors. While Debtor lacked principled and competent management before filing for bankruptcy, DeWeese (in his relatively short time involved in this case) has managed to pull together schedules and monthly operating reports from what seems like a complete lack of appropriate record-keeping. DeWeese was able to present to the Court multiple potential contracts that were estimated to bring significant funds into the estate. While this Court ultimately denied those contracts for the reasons discussed above, the record still stands to show that there is a market, even possibly a lucrative market, for the grain and soybeans. DeWeese has shown he is an expert in organic grains, is uniquely informed about market trends, and has considerable contacts in the industry. If DeWeese can be retained by the Chapter 11 Trustee, DeWeese's expertise and contacts in this area well-may be the best path to attain maximum return on the estate's assets. Finally, the involvement of a Chapter 11 Trustee may also change the view of the regulators on any licensing concerns and the viability of reorganization.

## V. Conclusion

For all the foregoing reasons, the Court hereby orders Appointment of a Chapter 11 Trustee.

Ordered: October 6, 2023

Thad J. Collins

Chief Bankruptcy Judge